**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**LUBBOCK DIVISION**

**FILED**

**October 17, 2019**

KAREN MITCHELL
CLERK, U.S. DISTRICT COURT

| | | |
|---|---|---|
| **COVENANT HEALTH SYSTEM.** | § | |
| | § | |
| **PLAINTIFF,** | § | |
| | § | |
| **vs.** | § | **Civil Action No.** |
| | § | **5:19-CV-103-H** |
| **GROUP & PENSION ADMINISTRATORS,** | § | |
| **INC.** | § | |
| | § | |
| **DEFENDANT.** | § | |

**PLAINTIFF'S AMENDED COMPLAINT**

Plaintiff Covenant Health System files its Amended Complaint and respectfully shows the following:

**PARTIES**

1.      Plaintiff Covenant Health System ("CHS") d/b/a "Covenant Medical Center and Covenant Medical Center - Lakeside" is a Texas non-profit corporation doing business as a hospital in Lubbock County, Texas.

2.      Defendant Group & Pension Administrators, Inc. ("GPA") is a domestic corporation and has appeared in the case.  During all material times, GPA has acted as the plan administrator, claims administrator, or a "third party administrator" of various employers' healthcare plans or as an insurer of healthcare insurance policies. It may be served with process through its counsel of record.

3.      Defendant Pate Trucking Co., LLC ("Pate Trucking") is a domestic limited liability company.  It may be served with process through its registered agent, Mr. Zane Mead at 6510 70th Street, Lubbock, TX 79242 or wherever else he may be found.

1

**EXHIBIT 1**

4.      On information and belief, the Pate Trucking Co., LLC Employee Benefit Plan is a self-funded ERISA health benefits plan, and a proper defendant pursuant to ERISA § 502(d), 29 U.S.C. § 1132(d). "Self-funded" means that the Plan is not directly operated pursuant to one or more contracts for health insurance. Rather, it is directly responsible for the medical benefits paid pursuant to the Plan. CHS is informed and believes that Defendant Pate Trucking was the sponsor of the Pate Trucking Co., LLC Employee Benefit Plan, with ultimate responsibility for paying claims administered and processed by Defendant GPA under the Plan during the relevant time period. CHS is further informed and believes that Defendant Pate Trucking was the designated Plan Administrator for the Plan – as that term is understood under ERISA – during the relevant time period. CHS is informed and believed that several of the patients described in this Complaint who received services during the relevant time frame were beneficiaries and/or participants of the Plan at the relevant times when their services were rendered.

5.      Defendant Western Dairy Transport, L.L.C. ("Western Dairy") is a Delaware limited liability company with its principal place of business in Cabool, Missouri that is licensed to do business in the State of Texas.  It may be served with process through its registered agent, Mr. David Shelton at 771 County Road 176, Stephenville, TX 76401or wherever else he may be found.

6.      On information and belief, the Western Dairy Transport, LLC Pre-Tax Premium Plan is a self-funded ERISA health benefits plan, and a proper defendant pursuant to ERISA § 502(d), 29 U.S.C. § 1132(d). "Self-funded" means that the Plan is not directly operated pursuant to one or more contracts for health insurance. Rather, it is directly responsible for the medical benefits paid pursuant to the Plan. CHS is informed and believes that Defendant Western Dairy was the sponsor of the Western Dairy Transport, LLC Pre-Tax Premium Plan, with ultimate

2

responsibility for paying all claims administered and processed by Defendant GPA under the Plan during the relevant time period. CHS is further informed and believes that Defendant Western Dairy was the designated Plan Administrator for the Plan – as that term is understood under ERISA – during the relevant time period. CHS is informed and believed that several of the patients described in this Complaint who received services during the relevant time frame were beneficiaries and/or participants of the Plan at the relevant times when their services were rendered.

7.      Defendant Friona Industries, L.P. ("Friona Industries") is a Delaware limited partnership with its principal place of business in Amarillo, Texas that is licensed to do business in the State of Texas.  It may be served with process through its registered agent, CT Corp System at 1999 Bryan St., Ste. 900, Dallas, TX 75201-3136 or wherever else it may be found.

8.      On information and belief, the Friona Industries, L.P. Employee Benefit Plan is a self-funded ERISA health benefits plan, and a proper defendant pursuant to ERISA § 502(d), 29 U.S.C. § 1132(d). "Self-funded" means that the Plan is not directly operated pursuant to one or more contracts for health insurance. Rather, it is directly responsible for the medical benefits paid pursuant to the Plan. CHS is informed and believes that Defendant Western Dairy was the sponsor of the Friona Industries, L.P. Employee Benefit Plan, with ultimate responsibility for paying claims administered and processed by Defendant GPA under the Plan during the relevant time period. CHS is further informed and believes that Defendant Friona Industries was the designated Plan Administrator for the Plan – as that term is understood under ERISA – during the relevant time period. CHS is informed and believed that several of the patients described in this Complaint who received services during the relevant time frame were beneficiaries and/or participants of the Plan at the relevant times when their services were rendered.

3

9.      Defendant Lori's Gifts, Inc.  ("Lori's Gifts") is a Texas corporation with its principal place of business in Carrollton, Texas.  It may be served with process through its registered agent, CT Corp System at 1999 Bryan St., Ste. 900, Dallas, TX 75201-3136 or wherever else it may be found

10.     On information and belief, the Lori's Gifts Employee Health Plan is a self-funded ERISA health benefits plan, and a proper defendant pursuant to ERISA § 502(d), 29 U.S.C. § 1132(d). "Self-funded" means that the Plan is not directly operated pursuant to one or more contracts for health insurance. Rather, it is directly responsible for the medical benefits paid pursuant to the Plan. CHS is informed and believes that Defendant Lori's Gifts was the sponsor of the Lori's Gifts Employee Health Plan, with ultimate responsibility for paying all claims administered and processed by Defendant GPA under the Plan during the relevant time period. CHS is further informed and believes that Defendant Lori's Gifts was the designated Plan Administrator for the Plan – as that term is understood under ERISA – during the relevant time period. CHS is informed and believed that several of the patients described in this Complaint who received services during the relevant time frame were beneficiaries and/or participants of the Plan at the relevant times when their services were rendered.

11.     Defendant Santa Rosa Telephone Cooperative, Inc. ("Santa Rosa") is a Texas non-profit corporation with its principal place of business in Vernon, Texas.  It may be served with process through its registered agent, Kirk H Petty at 7110 Highway 287 East, P O Box 2128, Vernon, TX 76385-2128 or wherever else he may be found.

12.     On information and belief, the Santa Rosa Telephone Cooperative, Inc. Health Care Benefits Plan is a self-funded ERISA health benefits plan, and a proper defendant pursuant to ERISA § 502(d), 29 U.S.C. § 1132(d). "Self-funded" means that the Plan is not directly operated

pursuant to one or more contracts for health insurance. Rather, it is directly responsible for the medical benefits paid pursuant to the Plan. CHS is informed and believes that Defendant Santa Rosa was the sponsor of the Santa Rosa Telephone Cooperative, Inc. Health Care Benefits Plan, with ultimate responsibility for paying all claims administered and processed by Defendant GPA under the Plan during the relevant time period. CHS is further informed and believes that Defendant Santa Rosa was the designated Plan Administrator for the Plan – as that term is understood under ERISA – during the relevant time period. CHS is informed and believed that several of the patients described in this Complaint who received services during the relevant time frame were beneficiaries and/or participants of the Plan at the relevant times when their services were rendered.

13.     Defendants Pate Trucking, Western Dairy, Friona Industries, Santa Rosa, and Lori's Gifts are the plan sponsors and/or plan administrators of several employee benefits plans at issue in the captioned matter and related to the patient claims identified in Exhibit A.

14.     GPA, Pate Trucking, Pate Trucking Co., LLC Employee Benefit Plan, Western Dairy, Western Dairy Transport, L.L.C. Pre-Tax Premium Plan, Friona Industries, Friona Industries, Lori's Gifts, Lori's Gifts Employee Health Plan, Santa Rosa and Santa Rosa Telephone Cooperative, Inc. Health Care Benefits Plan are hereinafter collectively referred to as the "Defendants."

## **JURISDICTION & VENUE**

15.     Plaintiff's claims arise in part under 29 USC §§ 1001, et seq., Employment Retirement Income Security Act ("ERISA"), under 28 USC § 1331 (federal question jurisdiction).

4826-1419-3832.2/B5471/A59963/101519

16.     29 U.S.C. 1132(e)(1) states that "State courts of competent jurisdiction and district courts of the United States shall have concurrent jurisdiction of actions under paragraphs (1)(B) and (7) of subsection (a) of this section." 29 U.S.C. 1132(f) further provides that "[t]he district courts of the United States shall have jurisdiction, without respect to the amount in controversy or the citizenship of the parties, to grant the relief provided for in subsection (a) of this section in any action."

17.     Venue is appropriate in this Court under 29 U.S.C. 1132(e)(2), which states that "[w]here an action under this subchapter is brought in a district court of the United States, it may be brought in the district where the plan is administered, where the breach took place, or where a defendant resides or may be found, and process may be served in any other district where a defendant resides or may be found."

18.     Venue is also appropriately established in this Court under 28 USC § 1391 because Defendants conducts a substantial amount of business in this district and a substantial part of the events or omissions giving rise to the claims occurred in this district.

## FACTUAL BACKGROUND

19.     This lawsuit arises out of Defendants' failure to properly reimburse the claims at issue, as attached hereto as Exhibit A.[1]  CHS rendered hospital goods and services to the patients that were enrolled as beneficiaries and/or members of a health plan that was sponsored, administered and/or financed by Defendants.  These patients were admitted and hospitalized by CHS for treatment at CHS throughout 2014-2019.  Several of these patients needed emergency care or were otherwise direct in-patient admits since their prior facility did not have the ability to render the care they needed.  Compounding the issues, each patient presented CHS with an

---

[1] CHS has made a limited disclosure of the claims at issue pursuant to the privacy provisions of the Health Insurance Portability & Accountability Act ("HIPAA"), 42 U.S.C.§1320 *et. seq.*

insurance card at the time they sought service that either indicated it was part of the PHCS and/or HealthSmart Network or was silent as to the network for hospital or facility providers. Thus, many of the patients at issue had no network of hospital providers capable of providing the emergency and inpatient services that the healthcare plans at issue purportedly covered. Further, in the case of the patients treated under no-network plans, none of the insurance cards provided any guidance as to what the no network level of reimbursement would be. However, when CHS endeavored to verify benefits for these claims, it typically received a facsimile wherein GPA would advise that CHS would receive between 80-100% following application of the deductible. This payment information was not qualified with a reference to any allowable or allowed amount.

20.     Rather, and without providing any timely warning or explanation to CHS, Defendants adopted a reference based pricing model that supposedly applied to the patients    Under this pricing model, Defendants would typically  reimburse CHS 112% of Medicare for the services rendered.  However, when CHS would receive the remittance advice following performing services, GPA would inexplicably revert back to acknowledging the existence of the preferred provider organization ("PPO") network noting that CHS was rendering care as part of a preferred provider organization, and the sole basis for the under-reimbursement would typically be CO 45, which is defined as "Charges exceed **your** contracted/legislated fee arrangements." All taken together, Defendant GPA continuously represented that these patients were subject to a PPO network.

21.     The way GPA administered the various healthcare plans and the way all of the Defendants ultimately reimbursed the claims violates both the terms of the healthcare plans and ERISA in the event that the PHCS and/or HealthSmart Facility Agreements do not govern the

7

services rendered.  Since 2014, Defendants, Pate Trucking, Western Dairy, Friona Industries, Santa Rosa, and Lori's Gifts, among other employers, through their use of GPA, elected to pay the respective benefits to CHS on a reference based pricing basis that was 112% of Medicare rates.  Upon information and belief, the various healthcare plans at issue actually permitted them to pay CHS one of several, much higher levels of payment, and actually did not mandate the lower percentage of Medicare level of payment.  CHS believes that GPA put no effort into setting specific reference prices for individual procedures at any level that any hospital in the geographic area was willing to accept.  The 112% of Medicare paid by GPA for every conceivable medical service rendered represents an inadequate level of payment that no hospital in the greater Lubbock area would accept as payments.  Moreover, GPA did not limit the attempt to apply at referenced based pricing to elective procedures.  Rather, GPA imposed the percentage of Medicare price on all claims whether it be for emergency, direct ICU admits, inpatient, and outpatient care that was provided by CHS.  In many of these instances, CHS believes that the healthcare plan benefits allowed for CHS to be reimbursed at an allowed charge at reasonable and customary rates.  Thus, Defendants' efforts to implement referenced based pricing were not reasonable and they were not targeted to any level of payment that similarly situated hospitals in the region were willing to accept.

22.     Defendants' actions to date also violate the terms of the Affordable Care Act.  The Departments of Labor, Health and Human Services, and Treasury provided some guidance concerning FAQs about Affordable Care Act Implementation, Part XIX at p. 3-4 available at https://www.cms.gov/CCIIO/Resources/Fact-Sheets-and-FAQs/Downloads/Reference_Pricing_FAQ_101014.pdf)  After summarizing the comments they

4826-1419-3832.2/B5471/A59963/101519

received, the three agencies set forth the following principles concerning reference based pricing

plans:

    a.  They are not to function **as a subterfuge for otherwise prohibited limitations on coverage.** The Departments again reiterated their overarching concern that the reference pricing scheme "does not function as a subterfuge for otherwise prohibited limitations on coverage" – a clear and deliberate reference to ACA's ban on lifetime and annual maximums, and the maximum out of pocket (MOOP).

    b.  Referenced-based pricing is **Inapplicable to the provision of emergency services.** The medical services procedures to which reference pricing applies should be limited to those for which a plan member has an opportunity to make "an informed choice of provider."

    c.  Plans should have procedures to ensure that an adequate number of providers that accept the reference price are available to participants and beneficiaries. For this purpose, plans are encouraged to consider network adequacy approaches developed by States, as well as reasonable geographic distance measures, and whether patient wait times are reasonable. . . ."

    d.  Plans should have procedures to ensure that an adequate number of providers accepting the reference price meet reasonable quality standards."

    e.  "Plans should have an easily accessible exceptions process, allowing services rendered by providers that do not accept the reference price to be treated as if the services were provided by a provider that accepts the reference price. . . ."

    f.  **Disclosure in SPD**. "Plans should provide information regarding the pricing structure, including a list of services to which the pricing structure applies and the exceptions process," in an easily accessible form, such as in the SPD.

23.    These guidelines make clear that any attempt to impose "reference pricing" only in

the sense that a plan pays a fixed amount will be found insufficient unless there are additional

safeguards for quality and reasonable access, which did not take place here.

24.    In addition to the network adequacy issue, as per CHS' normal protocol, each patient

signed a "Conditions of Admission" agreement upon admission to CHS whereby he or she

acknowledged his or her respective responsibility to pay not only his or her co-insurance and

deductibles, but all amounts not covered by their health plan.  Here, because Defendants paid at

such an inadequate level, a significant balance bill was almost always generated due to

Defendants' failure to pay, resulting in the members being held responsible for the amounts

outstanding.  In these cases, Defendants deliberately adopted a self-funded plan structure that

included NO network of hospital or facility providers who could provide emergency or inpatient hospital care. Thus, these Defendants left their respective members with no adequate options for obtaining these covered medical services from network providers.  Given the questionable set up of these healthcare plans, the failure to maintain a network of hospital facilities that could provide emergency or inpatient care, and the across the line payments, all out-of-pocket cost sharing amounts including CHS' bills must count towards the maximum out of pocket ("MOOP") limit.   Further, after the patient's maximum out of pocket has been met in any given calendar year for any given participant or beneficiary, Defendants must pay 100% of the billed charges.

25.       Finally, separate and apart from Defendants' numerous violations of the ACA, Defendants are also liable to CHS because their agent, GPA, repeatedly and consistently misrepresented the nature of their members' coverage for important healthcare services to both CHS and the members.  As noted above, several member cards referenced the PHCS and/or HealthSmart networks for practitioners and ancillary services, but were silent as to the network for hospital and other similar medical facilities.  GPA provides these member cards to the members of the various health benefit plans it is administers. Those cards identify GPA as the party responsible for paying providers for medical services provided to plan members. GPA intends for members to provide their identification cards to providers and for providers to rely on those identification cards in rendering medical services to their members. The identification cards do not contain any limitations as to the amounts that will be reimbursed to providers by GPA and/or the Defendants and do not disclaim GPA and/or the Defendants' common law liability to providers to pay the reasonable value of services provided to members. In addition, every single remittance advice that was generated for the Defendants' patients at issue indicated

10

that the patients were subject to a PPO plan and the typical under-reimbursement code CO 45 was defined **as charges exceed your contracted/legislated fee arrangement.** [emphasis added]. Further, GPA's own verification of benefits noted that CHS would be paid at a rate of 80-100% following the deductible being met.

26. All of these statements and actions amount to representations concerning the networks and gave rise to expectations that Defendants were honoring the same. Several times throughout the course of each of the Defendants' insureds respective treatments, CHS called GPA to verify benefits, confirm network status, and seek authorizations for continued care. At all relevant times, GPA represented to CHS that its insureds had full coverage for the treatments and services rendered by CHS. Further, at no times was CHS advised during the verifications that referenced based pricing governed the members. In addition, several of the patients at issue also presented at CHS' emergency department.

27. The hospital goods and services at issue were rendered by CHS pursuant to either the Facility Participation Agreement with PHCS and/or HealthSmart as statements by GPA indicated the network still applied and/or at minimum with the expectation of being reimbursed in at the usual customary and reasonable amount for the greater Lubbock geographical zip code. Defendants through their Administrator GPA historically engaged in the following acts:

    a. Verifying benefits with CHS personnel;

    b. Pre-authorizing certain claims;

    c. Accepting submission of the claim from CHS;

    d. Processing the claim for payment;

    e. Repricing the claim pursuant to the fee schedule contract rates in the Facility Participation Agreement;

11

    f.   Corresponding verbally and in writing with CHS collectors regarding needs for medical records or other additional information for processing the claims; and

    g.   Issuing checks to CHS in payment for the services rendered.

28.    Defendants knew that these incomplete statements were false at the time they were made, or at least knew that they had no reasonable basis for making them.  Coverage was confirmed with zero information that the coverage would only apply to the tiny fraction of the total charges remaining after GPA arbitrarily reduced the total charges pursuant to some nebulous "allowable" claims limit methodology.  GPA made them in the hope that CHS would provide quality care to its members without requiring payment upfront.  GPA should be required to pay CHS' reimbursement claims consistent with the representations they made when CHS called to verify the patients' insurance.

29.    To add insult to injury, Defendants also sent certain claims out to third party auditors for review.  These reviews are applying vague and confusing criteria to these claims, rather than the usual and customary or contracted-for rates, resulting in gross under-reimbursements.  To date, CHS has been paid a mere $338,069.10 for the services rendered, which represents 13% of its billed charges, and is due at least an additional $2,223,036.39.

## BREACH OF CONTRACT

30.    CHS incorporates by reference the allegations of the above paragraphs herein.

31.    Despite CHS' demands for payment, Defendants (1) have failed to perform its obligations under the Facility Participation Agreement for those patients that are subject to the same; and (2) failed to fulfill its obligations for patients who signed Consents of Admissions; specifically, the patients agreed to pay for the hospital charges to the extent that insurance did not cover the same.  It is common that CHS' costs exceed the MOOP costs for the patients that

4826-1419-3832.2/B5471/A59963/101519

are covered by reference based pricing healthcare plans that have no networks for hospital facilities. Defendants are responsible for paying the charges incurred for the hospitals goods and services rendered to the patients. Defendants breached the Facility Participation Agreement and/or the Affordable Care Act by failing to pay these claims. As a direct and proximate result of Defendants' breach, CHS has suffered actual damages in the amount of at least $2,223,036.39 and is entitled to recover its damages from Defendants.

32.    CHS has demanded payment of this account more than thirty (30) days prior to the date that judgment would be entered in this cause.

33.    All conditions precedent either to Defendants' obligation to pay CHS or to CHS' rights to recover from Defendants have been performed, have occurred, or have been excused.

34.    CHS has presented its claim for performance to Defendants, but Defendants have refused to pay the amount due. Accordingly, CHS has retained the undersigned attorneys to bring suit to recover the amount owed. Pursuant to Chapter 38 of the Texas Civil Practice and Remedies Code, CHS is entitled to an award of the reasonable attorneys' fees incurred herein

### UNJUST ENRICHMENT/QUANTUM MERUIT

35.    CHS incorporates by reference the allegations of the above paragraphs herein.

36.    In the alternative, CHS is entitled to recover the above stated sum from Defendants under unjust enrichment and *quantum meruit* causes of action. CHS earned fees for the hospital goods and services that CHS provided and sold to the Defendants' insureds, and which the Defendants' insureds received from, but for which Defendants have not paid. Thus, Defendants' insureds accepted these valuable hospital goods and services from CHS and have used and enjoyed their benefits under circumstances that reasonably notified them that CHS expected to be paid by them. Accordingly, pursuant to unjust enrichment and *quantum meruit* causes of action, CHS is entitled to judgment against all

13

Defendants, jointly and severally, for the above-stated principal sum, plus pre-judgment and post-judgment interest thereon, and attorneys' fees and costs pursuant to Sections 38.001, *et. seq.*, of the Texas Civil Practice and Remedies Code.

## COMMON LAW FRAUD, STATUTORY FRAUD, AND FRAUDULENT INDUCEMENT

37.     CHS incorporates by reference the allegations of the above paragraphs herein.

38.     In the alternative, Defendants, through their administrator GPA, made numerous assurances and representations concerning the network status of the Defendants' insureds and the expected amount to be paid on the claims.   These and other omissions, assurances, and representations made by GPA to CHS were material in CHS' decision to render hospital goods and services to the Defendants' insureds.

39.     In addition, upon information and belief, GPA made statements to the Defendants' insureds that CHS would accept the referenced based pricing reimbursements as payment in full. The omissions, assurances, and representations were misleading and false, and GPA either knew the representations were misleading and false or acted recklessly in making the representations. CHS and the Defendants' insureds relied on GPA's actions and representations, which has resulted in CHS suffering significant damages that exceed jurisdictional minimums of this Court as a result of Defendants' actions.

## NEGLIGENCE AND NEGLIGENT MISREPRESENTATION

40.     CHS incorporates by reference the allegations of the above paragraphs herein.

41.     In the alternative, CHS would show that it is business custom in the healthcare and insurance industries for healthcare providers to call insurance companies or their agents to verify/pre-certify insurance coverage, eligibility, and benefit levels for patients being treated. Insurance companies and their agents owe duties to healthcare providers to reasonably and

14

adequately investigate the existence of insurance coverage and benefits and submit accurate information to the healthcare provider.

42.     Healthcare providers are without the knowledge or means to gain such knowledge concerning insurance coverage and benefits, and must therefore rely upon the representations of insurance companies or their agents in determining the method and means of being reimbursed for the medical services provided.  Once insurance coverage is "verified" and "certified" by an insurance carrier, as those terms are understood in the industry, other potential avenues of reimbursement, deposits, payment up front, are usually foregone and/or waived due to the existence of commercial insurance coverage.  The healthcare provider must therefore be able to rely upon the insurers' conveyance of accurate, complete, and current eligibility status of their members/insureds and whether the anticipated procedure is a covered procedure under the policy.

43.     Defendants used GPA to administer their claims at all relevant times.  In that role, GPA provided identification cards to the members of its various health benefit plans.  Those cards all identify GPA as the party responsible for paying providers for medical services rendered to plan members.   Specific representations made by Defendants through their administrator GPA as described above were made to CHS in response to CHS' specific inquiries regarding eligibility and coverage for the specified hospital services and goods provided.  CHS informed GPA it was obtaining this information with respect to providing hospital services and goods to Defendants' members/insureds.  CHS relied on the representations provided by GPA.  It was foreseeable that CHS would rely upon the representations and verifications of GPA.  CHS had the reasonable expectation of being paid for the valuable services extended to Defendants' members/insureds in good faith.

15

44.     Defendants breached duties owed to CHS as set forth above as they failed to exercise reasonable care and competence in conveying true and accurate information concerning eligibility and coverage for the medical services provided.  CHS will show that it has been damaged as a result of Defendants' negligence and negligent misrepresentations.  Defendants, through their Administrator GPA, never stated any of the limitations or exclusions at the time CHS was verifying benefits, but GPA has subsequently sought to apply these purported limitations or exclusions to pay far less for the services rendered.  At no point during the verification process did Defendants explain to CHS that the healthcare plans purported to have a limitation or exclusion on benefits whereby the healthcare plans would not pay more than 112% of Medicare for all of CHS' services.  Rather, GPA consistently advised that CHS should expect to reimbursed 80-100% of its charges.  As a proximate cause of said misrepresentations and mis-verifications, CHS has been damaged due to Defendants' insistence on paying a fraction of the bills for the patients' care which totals $2,223,036.39, including interest thereon at the highest legal rate.

45.     In addition to Defendants' pattern of conduct misleading CHS, GPA also engaged in a pattern of conduct misleading the patients checking on their benefits, resulting in these patients seeking services from CHS based on these misrepresentations.  For example, patient RG who is a participant of the Santa Rosa Telephone Cooperative, Inc. Health Care Benefits Plan was treated by CHS.  When CHS followed up with patient RG in or around November 19, 2018, concerning the outstanding balance on RG's respective claim, patient RG advised CHS that insurance had stated that patient's claim was covered at 100% and that was why patient agreed to have the procedure done at CHS.

16

46.     CHS brings this cause of action in its own right, and not on behalf of any of its patients.  This cause of action is distinct and separate from ERISA causes of action, and is not preempted by ERISA.

## PROMISSORY ESTOPPEL

47.     CHS incorporates by reference the allegations of the above paragraphs herein.

48.     In the alternative, CHS is entitled to recover the above stated sum from Defendants under the promissory estoppel of action.  Defendants made promises to CHS that Defendants would make payment for properly submitted claims and would pay between 80-100% of such claims following application of the deductible.  Defendants breached such promises by failing to pay and/or under-paying the claims submitted by CHS.

49.     CHS reasonably and justifiably relied upon Defendants' promises, and such reliance was foreseeable to Defendants.  Defendants' failure to keep their promises has caused injury and damages to CHS.

50.     CHS brings this cause of action in its own right, and not on behalf of any of its patients.  This cause of action is distinct and separate from ERISA causes of action, and is not preempted by ERISA.

## ERISA SECTION 502(A)(1)(B)

51.     CHS incorporates by reference the allegations of the above paragraphs herein.

52.     In the alternative, pursuant to the "Conditions of Admission" form executed by each GPA insured or beneficiary (and/or a representative of such individual), CHS is the assignee of all benefits under the healthcare plans for each of the claims at issue.  Further, each insured or beneficiary agreed to be financially responsible for the claims at issue to the extent they were not

17

paid in full by the insurer.  Accordingly, CHS is entitled under ERISA to pursue all payments due under the healthcare plans for the medical services rendered to those individuals at CHS.

53.    CHS diligently pursued all internal appeals available under the healthcare plans and exhausted all appeal remedies.  In doing so, CHS corresponded directly with entities and/or individuals that the Defendants held out to be the correct persons and/or parties to communicate with regarding the failure to pay the whole bill.

54.    Defendants (a) deliberate disregard of the "Reasonable and Customary" level of payment called for under the healthcare plans and (b) payment of 112% of Medicare in each instance was erroneous, arbitrary and capricious and an abuse of discretion, to the extent that GPA was delegated discretion under the healthcare plans.

55.    On information and belief, Defendants did not even bother to calculate the "Allowable Claim Limit" as required under the healthcare plans.  Rather, Defendants completely disregarded the Allowable Claim Limit and relied entirely upon the "Claims Review and Audit Program" provisions that were allegedly embedded in the summary plan description.  This was arbitrary and capricious because these provisions do not comport with the healthcare plan definitions of Allowable Claim Limit and/or Reasonable and Customary.  In addition the healthcare plans do not incorporate or ever reference these hidden provisions.  Thus, they are irrelevant to how the reimbursements should be calculated.

56.    CHS is entitled it its reasonable attorneys' fees under ERISA given Defendants' years long insistence on adhering to unjustifiable interpretations of their respective healthcare plans.

4826-1419-3832.2/B5471/A59963/101519

57.    Finally, CHS reserves all of its rights under ERISA, including the right to balance bill the patients at issue, notwithstanding any language in the plans that purport to force CHS to give up such rights.

**ACA SECTION 2707(B) VIA ERISA SECTION 502(A)(1)(B)**

58.    CHS incorporates by reference the allegations of the above paragraphs herein.

59.    CHS proceeds on this cause of action under ERISA pursuant to the assignment of benefits it has obtained from the patients as alleged above as part of the Consents of Admission.

60.    In the alternative, and to the extent that GPA's interpretation of and reliance upon the "Claim Review and Audit" provisions buried deep within the Summary Plan Description ("SPD") is not held to be an abuse of discretion in violation of ERISA, the healthcare plans have nevertheless been violated for dozens of CHS' benefit claims.  Specifically, the ACA mandates that self-funded ERISA plans offer a MOOP applicable to all essential health benefits ("EHBs") of no more than $6,350 in calendar year 2014, $6,600 in calendar year 2015, $6,850 in calendar year 2016, $7,150 in calendar year 2017, $7,350 in calendar year 2018, and $7,900 in calendar year 2019.

61.    ERISA is an appropriate mechanism for the enforcement of the federal ACA requirements imposed on self-funded ERISA plans.  See, e.g., 29 U.S.C. 1185d (which incorporates the provisions of part A of title XXXVII of the PHS Act including ACA Section 2707, into ERISA).

62.    CHS therefore, and in the alternative, seeks payment for the entire amount charged by CHS that exceeds the applicable MOOP limit in each calendar year in which the MOOP threshold was incurred by any of the Defendants' beneficiaries or participants.  Because the Defendants' healthcare plans deliberately chose not to maintain a network of hospital facilities that could provide emergency or inpatient care, all out-of-pocket cost sharing amounts, including

19

balance billing must count towards the MOOP limit.  After the MOOP limit has been met in any given calendar year for any given participant or beneficiary, the healthcare plans must pay 100% of billed charges.

63.    CHS is also entitled to its reasonable attorneys' fees under ERISA.

## CONDITIONS PRECEDENT

64.    All conditions precedent necessary for each of the foregoing causes of action have occurred, have been performed by CHS, or have been waived.

## JURY DEMAND

65.    CHS demands a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

66.    WHEREFORE, CHS prays that Defendants be cited to appear and answer this lawsuit and for the following:

   a.  That judgment be entered against Defendants, jointly and severally, for CHS' actual damages in the amount of at least  $2,223,036.39, exclusive of penalties, interest and attorneys' fees;

   b.  That CHS be awarded its reasonable attorneys' fees and costs of court;

   c.  That CHS be awarded pre- and post-judgment interest at the highest legal rate; and

   d.  That CHS be awarded such other and further relief to which it is justly entitled.

20

Respectfully submitted,

**CLARK HILL STRASBURGER**

_[signature: Carolyn L. Douglas]_

**CAROLYN L. DOUGLAS**
State Bar No. 24045800
carrie.douglas@clarkhillstrasburger.com
2301 Broadway Street
San Antonio, Texas 78215
(210) 250-6000
(210) 250-6100 Fax

**CHARLES "SCOTT" NICHOLS**
Texas Bar No. 14994100
scott.nichols@clarkhillstrasburger.com
909 Fannin Street, Suite 2300
Houston, Texas 77010-4035
(713) 951-5600
(713) 951-5660 Fax

**ATTORNEYS FOR PLAINTIFF
COVENANT HEALTH SYSTEM**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on the _____ day of October, 2019, a true and correct copy of the foregoing _Plaintiff's Amended Complaint_ was filed with the Clerk of Court using the CM/ECF system.

William J. Akins, Esq.
FISHERBROYLES, LLP
100 Congress Avenue, Suite 2000
Austin, Texas 78701

_[signature: Carolyn L. Douglas]_

Carolyn L. Douglas

21